# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| ANCHOR WALL SYSTEMS, | Civil No. 99-1356 (JRT/FLN) |
| Plaintiff, | |
| v. | |
| ROCKWOOD RETAINING WALLS, INC., RAYMOND R. PRICE, GERALD P. PRICE, GLS INDUSTRIES, INC., and EQUIPMENT, INC., | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | |

Dennis C. Bremer, Alan G. Carlson, and Joseph W. Winkels, **CARLSON CASPERS VANDENBURGH & LINDQUIST**, 225 South Sixth Street, Suite 3200, Minneapolis, MN 55402; Douglas A. Strawbridge, **ANCHOR WALL SYSTEMS, INC.**, 5959 Baker Road, Suite 390, Minnetonka, MN 55345, for plaintiff.

Michael E. Florey, Jonathan E. Singer, and Katherine A. Moerke, **FISH & RICHARDSON**, 60 South Sixth Street, Suite 3300, Minneapolis, MN 55402; Casey A. Kniser, Eric H. Chadwick, and Randall T. Skaar, **PATTERSON THUENTE SKAAR & CHRISTENSEN,** 80 South Eighth Street, Suite 4800, Minneapolis, MN 55402-2100; Malcolm L. Moore, **MOORE HANSEN & SUMNER**, 225 South Sixth Street, Suite 4850, Minneapolis, MN 55402-4612; Michael F. McGrath, **RAVICH MEYER KIRKMAN MCGRATH NAUMAN & TANSEY,** 80 South Eighth Street, Suite 4545, Minneapolis, MN 55402, for defendants.

Plaintiff Anchor Wall Systems ("Anchor") brought this patent infringement action against defendants Rockwood Retaining Walls, Inc. ("Rockwood"), Raymond R. Price, Gerald P. Price, GLS Industries, Inc. ("GLS"), and Equipment, Inc. ("Equipment"). After more than eight years of litigation – including a summary judgment ruling in favor

of defendants, a successful appeal by Anchor to the Federal Circuit, a second summary judgment motion, a stipulated stay of the case to allow the United States Patent and Trademark Office ("PTO") to reexamine Anchor's patents, and a motion to dismiss – a jury concluded that defendants Rockwood, Raymond R. Price, Gerald P. Price, GLS, and Equipment induced infringement of several of Anchor's patents and that GLS directly infringed on several of Anchor's patents.   The jury awarded Anchor $24,185,484 in damages.   Defendants have now filed five separate motions for either judgment as a matter of law or a new trial.   Anchor has also filed a motion for prejudgment and postjudgment interest, attorney's fees, and costs.   Finally, Anchor has filed several additional motions related to a stay preventing them from seeking to execute the judgment in this case, and a motion seeking sanctions.   For the reasons given below, the Court denies defendants' motions for judgment as a matter of law or a new trial; grants in part Anchor's motion for attorney's fees; grants Anchor leave to execute the judgment; and denies Anchor's motion for sanctions.

## BACKGROUND

Anchor is a licensing company based in Minnetonka, Minnesota, that owns patents on several designs for retaining-wall blocks.   Anchor's patents include Patent Numbers 5,704,183 ("the '183 patent") and 5,711,129 ("the '129 patent"), which are collectively referred to as the "Vertica" patent family, and Patent Numbers 5,827,015 ("the '015 patent") and 6,142,713 ("the '713 patent"), which are collectively referred to as the "Diamond" patent family.

Rockwood is a company based in Rochester, Minnesota, that also provides licenses for intellectual property related to retaining-wall blocks. Rockwood's designs include the "Classic," "StoneHedge," "Legend," "Cottage Stone," "Cottage Stone II," Cottage Stone III," and "Cottage Stone IV" blocks. GLS is the largest manufacturer and distributor of Rockwood blocks, and manufactures the blocks with equipment leased from Equipment. Raymond and Gerald Price were at one time owners and officers of Rockwood, GLS, and Equipment.

In September 1999, Anchor filed this patent infringement action against Rockwood, Raymond P. Price, Gerald P. Price, GLS, and Equipment. Anchor alleged that Rockwood's Classic blocks infringe on its Vertica patents and that Rockwood's Cottage Stone II, Cottage Stone III, and Cottage Stone IV blocks infringe on its Diamond patents. Anchor also alleged that each of the defendants induced the other defendants to infringe on its patents.

In April 2002, United States District Judge David S. Doty granted defendants' motion for summary judgment. *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 252 F. Supp. 2d 838 (D. Minn. 2002). This Order was later reversed in part by the United States Court of Appeals for the Federal Circuit. *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298 (Fed. Cir. 2003). The Federal Circuit disagreed with Judge Doty's construction of several critical claim terms, and remanded the case for further proceedings. Defendants later moved for summary judgment a second time based on the claim constructions given by the Federal Circuit, and this Court

denied that motion. *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, No. 99-1356, 2004 WL 2066823 (D. Minn. Sept. 7, 2004).

In February 2005, after the parties had submitted documents in preparation for trial, the parties submitted a joint motion to stay the case. (Docket No. 303.) The purpose of the stay was to allow the United States Patent and Trademark Office ("PTO") to re-examine several of Anchor's patents. After the PTO determined that each of the re-examined patents was valid, the stay was lifted in September 2006. (Docket No. 318.) The Court later denied an additional motion to dismiss brought by the defendants on October 30, 2007. (Docket No. 479.)

This case was tried before a jury beginning on January 22, 2008. Following several weeks of testimony, a jury deliberated for several days and concluded on March 3, 2008, that defendants Rockwood, Raymond R. Price, Gerald P. Price, GLS, and Equipment induced infringement of several of Anchor's patents and that GLS directly infringed on Anchor's patents. They jury did not find, however, that any infringement was "willful." The jury awarded Anchor $24,185,484 in damages. The Court now turns to the post-trial motions filed by the parties below, setting forth additional factual and procedural background as necessary.

## ANALYSIS

## I.   DEFENDANTS' MOTIONS FOR JUDGMENT AS A MATTER OF LAW OR NEW TRIAL

### A.   Motions for Judgment as a Matter of Law

Under Rule 50 of the Federal Rules of Civil Procedure, judgment as a matter of law is appropriate if no reasonable juror could have returned a verdict for the nonmoving party. *Weber v. Strippit, Inc.*, 186 F.3d 907, 912 (8th Cir. 1999).  In analyzing a Rule 50 motion, the Court must consider the evidence in the light most favorable to the nonmovant, resolve all factual conflicts in the nonmovant's favor, and give the nonmovant the benefit of all reasonable inferences. *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1002 (8th Cir. 2000).  "Judgment as a matter of law is appropriate when the record contains no proof beyond speculation to support the verdict." *Heating & Air Specialists v. Jones*, 180 F.3d 923, 932 (8th Cir. 2000).  However, "[a] party may not challenge a verdict in a post-trial motion for judgment as a matter of law absent a properly made motion for a directed verdict at the close of all evidence." *Hoechst v. Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1581-82 (Fed. Cir. 1996).

### 1.   Inducement Infringement

Under 35 U.S.C. § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer."  To prevail on an inducement claim, "the patentee must show, first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304-05

(Fed. Cir. 2002) (citation omitted).  In *DSU v. Med. Corp., v. JMS Co.*, 471 F.3d 1293 (Fed. Cir. 2006) (en banc), the Federal Circuit clarified the meaning of the specific intent requirement, explaining that it "requires more than just intent to cause the acts that produce direct infringement."  *Id*. at 1306.  Rather, "the inducer must have an affirmative intent to cause direct infringement."  *Id*. at 1306.

### a.      Judge Doty's Order

Defendants first argue that there was insufficient evidence that any defendant intended to induce infringement of Anchor's patents before August 2003.  Defendants base this contention on the combination of (1) evidence that they had received advice from counsel that they did not infringe, and (2) the fact that Judge Doty ruled on April 5, 2002, that defendants' products did not infringe on Anchor's patents.[1]  *See Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 252 F. Supp. 2d 838 (D. Minn. 2002), *rev'd*, 340 F.3d 1298 (Fed. Cir. 2003).  Defendants argue that because of similarities between the advice they received from counsel and the analysis provided by Judge Doty, the fact that they received this advice undermines any specific intent to infringe as a matter of law.  Though they undisputedly failed to raise this issue at the close of trial, defendants argue that this failure should be excused because Judge Doty's 2002 Order was not admitted into evidence.  For the reasons given below, this Court finds that defendants

---

[1] Defendants also note that they testified that they did not intend to infringe.  It is plain, however, that their own assurances did not demonstrate their lack of intent as a matter of law.

failed to preserve the question of whether they lacked the intent to induce infringement as a matter of law.

Before addressing defendants' reliance on Judge Doty's Order, the Court first notes it is only relevant to a narrow period of the time when defendants allegedly induced infringement. The Order clearly could not have impacted any defendant's state of mind before it was written. Thus, the Order is not relevant to any acts of inducement occurring before April 5, 2002.[2] In addition, defendants have offered no explanation for how the Order could have impacted their state of mind after it was formally reversed by the Federal Circuit. Thus, the Order is not relevant to any acts of inducement occurring after the Federal Circuit rendered it a legal nullity on August 13, 2003. Thus, the only possible relevance of Judge Doty's Order was between April 5, 2002, and August 13, 2003, when the Order was in effect.

The Court next emphasizes the clear and unacceptable risk that the Order would have unfairly prejudiced the jury if it was admitted into evidence. The jury in this case was asked to consider whether GLS directly infringed on Anchor's patents. Anchor's inducement claims also required the jury to consider whether any direct infringement occurred. *See Minn. Mining & Mfg. Co.*, 303 F.3d at 1304-05. In sum, each of Anchor's claims – and every dollar of the jury's $24 million verdict – hinged at least in part on a determination of whether defendants' blocks infringed on Anchor's patents. The Court

---

[2] The Court adds that for the time period before 2002, the plausibility of defendants' reliance on those letters was a question for the jury. (*See, e.g.*, Trial Tr. Volume X at 1648-55 (noting suspicions about the nature of the relationship between defendants and their attorney).)

underscores this point because these direct infringement issues were nearly identical to the issues addressed by Judge Doty in his 2002 Order.  Because that Order was reversed by the Federal Circuit, it was categorically irrelevant to the question of whether defendants' blocks actually infringed.  If the Order had been admitted, however, there is great danger that the jury would have been improperly influenced by Judge Doty's conclusions.  In short, the jury endured a five-week trial composed of exhaustive, nuanced discussion of block design and patent law.  Had the jury known that an experienced United States District Judge had addressed nearly identical questions to those on the verdict form, there would have been an unacceptable danger that the jury would have abdicated its responsibility to make an independent decision, and simply agreed with Judge Doty.

The Federal Circuit dealt with similar circumstances in *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557 (Fed. Cir. 1993).  In *Mendenhall*, the plaintiff alleged that the defendant had infringed on its patents for paving materials.  *Id*. at 1559-60.  Prior to bringing a lawsuit, the plaintiff had successfully sued several other companies for infringing on the same patents.  *Id*. at 1566.  Before trial, the defendant sought to exclude any evidence of this prior litigation.  The defendant expected the plaintiff to offer this evidence to show that the defendant's infringement was willful, and argued that it would be unfairly prejudicial on other issues presented to the jury, such as the underlying question of whether the defendant's products actually infringed.  *Id*.  The trial judge provisionally granted the motion, and offered the following explanation worth quoting in full:

Well, we strive in every trial, every jury trial, not to let the jury know how the judge feels about [the case] – we put up all sorts of barriers, insulation between the judge and the jury, because everything I've ever read about it indicates that the jury is always looking for some indication as to how the judge feels about the case, and I agree with the Defendant's position here that permitting this jury to have my brother judge's 140-page opinion involving many of the same type claims as are advanced here would be to short-circuit the fact-finding mission of this jury. I'm greatly concerned that they would say, "Look, a federal judge has looked at these similar claims and has said so-and-so, and we'll just go along with that decision," and I think it's an invitation for the jury to abdicate their responsibilities . . .

*Id.* at 1567 n.11. Despite further attempts by the plaintiff to introduce the disputed evidence at trial, the trial judge declined to depart from this ruling. The trial judge noted that while evidence of the earlier litigation was relevant to some issues in the case, it would simply create an unacceptable danger of unfair prejudice as to others. *Id.* at 1568. The Federal Circuit upheld this determination. *Id.* at 1576.

Here, as in *Mendenhall*, the core determinations for the jury – on which all other issues in the case hinged – were whether the defendants' retaining-wall blocks infringed on Anchor's patents. The procedural history of this case and the jury's mixed verdict demonstrate that these were close questions. In those circumstances, as in *Mendenhall*, it is difficult to imagine anything likely to have a more significant, prejudicial impact on the jury than Judge Doty's 2002 summary judgment Order.[3] Indeed, the prejudicial impact of Judge Doty's Order would have been even greater than the Order excluded in *Mendenhall*, because Judge Doty's Order dealt with the *very same blocks*. In light of that

---

[3] The Court adds that admitting Judge Doty's Order may also have significantly lengthened the trial. Had it been admitted Anchor presumably would have been entitled to present additional context, in an attempt to clarify the Order's meaning and the role of the Federal Circuit.

background, it is difficult to conceive of any circumstances in which this evidence would not be excluded under Rule 403 of the Federal Rules of Evidence.

In light of that background, it clearly would have been preferable to address the significance of Judge Doty's Order in advance of trial.  The question of whether it was legally possible for defendants to intend to induce infringement while that Order was in effect is a significant question.  However, it is not a question that hinges on the additional arguments or evidence presented at trial, and it clearly could have been raised either in a summary judgment motion or at the pretrial hearing on the parties' motions in limine.  If the Court determined that defendants were correct – and that an intent to infringe was impossible for a particular period of time – the Court could have then eliminated that particular time period from the case.  This would have prevented any entanglement of the Order with issues set for trial – and, in turn, eliminated the risk of severely prejudicing the jury – and also would have allowed Anchor to present its damage claim in a way that accounted for the 16-month time gap.  As is evident from the procedural history recounted below, however, defendants never made such a motion.  Rather, they generally treated the Order as something to deal with at trial, without ever expressly relating it to their inducement claims, *DSU*, or the inducement intent requirement.  The first time that they meaningfully raised this issue was after trial, when a ruling in their favor would require that this five-week trial, in a case filed nearly a decade ago, be tried again.  In those circumstances, the Court finds that defendants failed to raise this issue in a manner that was sufficient to preserve it as a basis for post-trial relief.

Defendants' first opportunity to address this issue came when defendants moved for summary judgment in 2004, after the Federal Circuit's reversal of Judge Doty's Order.[4]   There is no indication in the record, however, that the defendants raised this issue, or otherwise addressed their intent to induce infringement.  (*See* Docket No. 199.) Indeed, defendants appear to have failed to address Anchor's inducement claims separately from Anchor's direct infringement claims in any way.  (*Id*.)

Later, in October 2004, the parties filed documents in preparation for trial, including motions in limine.  Anchor's motions included a motion to preclude references to Judge Doty's 2002 summary judgment Order.  (Docket No. 272.)  Anchor argued that Judge Doty's Order was irrelevant to the jury's considerations, because the Federal Circuit's rulings had rendered it a legal nullity.  Anchor added that mention of the Order would lead to a significant risk of confusion and wasted time, because the Court and the parties would have to explain the appeal process, and the particular grounds for Judge Doty's decision.  Finally, Anchor argued that the fact that Judge Doty had once ruled in defendants' favor – after considering questions nearly identical to the close questions posed to the jury – may impermissibly sway the jury toward reaching the same conclusions.

---

[4] *DSU*, the case cited above describing the intent requirement for inducement claims, was decided in 2006, two years after this summary judgment was argued.  However, *DSU* did not set forth a new principle of law.  Rather, it clarified which of two potentially conflicting precedents applied.  *See* 471 F.3d at 1304-06 (addressing this issue in a section of the opinion titled "RESOLUTION OF CONFLICTING PRECEDENT").  In other words, while it certainly would have been clearer after *DSU* that Judge Doty's Order was potentially relevant to the inducement intent requirement, there was a sufficient basis for the defendants to raise the same challenge in 2004.

In response to this motion, defendants' offered a one-paragraph response, stating:

The Defendants agrees [sic] that [Judge Doty's] order is not relevant to the issue of patent infringement or invalidity.   But **depending on Anchor's trial presentation**, the existence of Judge Doty's order **may** become relevant.   Hence, a blanket exclusion should not be ordered before trial. Even if Anchor's counsel or witnesses make Judge Doty's summary-judgment order relevant during the trial, the Defendants will not offer any evidence of the order without first seeking a further ruling from the Court.

(Docket No. 288 at 19) (emphasis added).   In short, the question of the relevance of Judge Doty's Order was directly raised and discussed by the parties in anticipation of trial in 2004.   Even if this issue had escaped defendants' attention before this motion, it gave defendants a clear opportunity to consider the Order's relevance, and to argue that Judge Doty's Order should exclude a particular time period from Anchor's inducement claims. Defendants, however, made no specific mention of Anchor's inducement claims, and made no argument that the Order negated their intent to induce infringement as a matter of law.   Moreover, they vaguely suggested that whether the Order is relevant **would depend on what happened at trial**.   The question of the legal possibility of a specific intent to induce infringement after Judge Doty's Order had nothing to do with any additional evidence, and – as explained above – it is almost impossible to imagine circumstances in which it would be acceptable to offer this type of evidence to the jury.

Defendants also filed a Trial Brief in 2004.   (Docket No. 227.)   That brief included sections titled "Unresolved Substantive Issues," "Unresolved Evidentiary Issues," and "Unresolved Procedural Issues."   (*Id.* at 1.)   That document does not discuss how Judge Doty's Order may impact the defendants' intent to infringe, and does not suggest that any particular periods of time should be excluded from Anchor's inducement claims.

- 12 -

Following the PTO's reexamination of Anchor's patents in 2005 and 2006, the stay on this case was vacated on September 27, 2006.  (Docket No. 318.)  In December 2006, just months later, the Federal Circuit issued the *DSU* decision.   That decision eliminated any doubt that in order to succeed on their inducement claims, Anchor would have to show that defendants specifically intended to induce infringement.  The decision also set the stage for any argument that defendants could not have intended to infringe while Judge Doty's Order was in effect.  In the months that followed, both parties sought leave to file additional motions for summary judgment.  (*See* Docket Nos. 419, 442.) Despite the *DSU* decision, however, defendants' merely asked for an opportunity to file a motion addressing subject matter jurisdiction, and failed to make any request to address the intent requirement for Anchor's inducement claims.

Before this case went to trial in January 2008, the defendants filed an Amended Trial Brief that again included an "Unresolved Issues" section.   (Docket No. 532.) Defendants again failed to make mention of any unresolved issues relating to Judge Doty's Order, or the need to exclude any particular periods of time from Anchor's inducement claims.

In addition, Anchor again filed a motion in limine seeking to exclude Judge Doty's 2002 summary judgment Order.  (Docket No. 500.)  As in its 2004 motion in limine, Anchor argued that this Order was not relevant to the issues to be decided by the jury, that it would waste considerable time for the parties to explain the Order's significance, and that it would prejudice the jury if they were told that a district judge had already expressed a view on whether defendants' blocks infringed on Anchor's patents.  (*See*

Docket No. 501.)  Defendants again responded – in slightly more than one page – that the Order "may" be relevant at trial if Anchor pursued allegations that the defendants willfully infringed on its patents.  (Docket No. 554 at 2.)  While defendants argued that it would be "unfair" not to allow them to note that Anchor's infringement claims were briefly dismissed, they offered no meaningful explanation of that position, and made no request to eliminate any particular time periods from the case.  Defendants' response did not mention Anchor's inducement claims, did not cite to *DSU* (or any other legal authorities), and made no claim that Judge Doty's Order negated any intent to induce infringing acts as a matter of law.

Similarly, when defendants were given an opportunity to address this motion in a pre-trial hearing, they indicated only that their position was the Order "**could** become relevant, **depending on the questions that are asked of the witnesses** by the plaintiff." (Tr. of Hr'g on Mots. in Limine, Docket No. 580 at 3-4) (emphasis added).  In other words, defendants again failed to specifically mention Anchor's inducement claims, the *DSU* decision, or how Judge Doty's Order may impact the defendants' specific intent to induce infringement.  Defendants' position also was again inconsistent with the position that Judge Doty's Order simply negated any specific intent to infringe as a matter of law, an argument that has nothing to do with the remainder of the evidence.  In short, they again treated this issue as something to be dealt with at trial, when any mention of the Order would pose an unacceptable risk of unfair prejudice.  In light of these filings and the defendants' position at the hearing – and in the absence of anything resembling the

argument presented now – this Court granted Anchor's motion in limine, with the caveat that it would be open to reconsidering that ruling if it became an issue at trial.  (*Id*. at 4.)

As defendants note, there were several additional occasions when these issues were raised at trial.  (*See, e.g*., Trial Tr. Volume XVI at 2909-16.)   The Court has reviewed these passages of the transcript carefully, however, and finds nothing that sufficiently raised this legal issue during trial.  Defendants repeatedly contended that Judge Doty's Order would help establish the **reasonableness** of their views on infringement.  (*See, e.g*., *id*. at 2913.)  However, they never contended that Judge Doty's Order made infringement a legal impossibility, or otherwise negated their intent to infringe as a matter of law.  They also failed to ask to exclude any particular time period from Anchor's inducement claims.  Instead, they continued to treat this issue as one that should generally unfold before the jury.  In other words, they continued to invite the Court to allow a narrow issue, dealing with the appropriate damages for a specific 16-month period, to taint the entire trial, which covered nearly ten years of damages.  These requests were distinct from the legal issue of whether specific intent was **legally possible** during that 16-month time period, and were unacceptable under Rule 403 of the Federal Rules of Evidence.

Finally, the defendants undisputedly failed to raise this issue in their Rule 50(a) motion for judgment as a matter of law.  There, the only inducement issues raised by the defendants were whether Raymond Price, Gerald Price, and Equipment took the requisite acts to be held liable under an inducement theory.  Defendants argue that this should be excused, because the evidence had already been excluded.  But, as noted above, if

defendants' theory is correct, this issue ultimately has very little to do with the presentation of evidence.  Thus, the fact that the Order was not admitted into evidence was not a barrier to raising this issue at the close of the trial.

In sum, when this issue was raised before trial, defendants failed to specifically argue that Judge Doty's order was relevant to Anchor's inducement claims, and failed to otherwise explain its position in a way that mirrors what they argue now.  Defendants merely broadly contended that this extraordinarily prejudicial evidence "may" be relevant, and generally treated Judge Doty's Order as possible corroborating evidence of the general reasonableness of their position throughout their alleged infringement.  In other words, they tried to channel this issue into trial, when it had the potential to prejudice the jury as to each of Anchor's claims.  In light of that approach, the Court concludes that the narrow legal issue now identified by defendants was waived; that Judge Doty's Order was properly excluded under Rule 403; and that defendants are not entitled to an opportunity to begin again, and approach this issue more narrowly.[5]

---

[5] The Court notes that instead of arguing that Judge Doty's Order made their intent legally impossible, another position may be that defendants actually, subjectively relied on Judge Doty's Order.  This is closer to the issues that were discussed at trial, and also fits more closely with the position that defendants took in advance of trial.  (*See, e.g.*, Trial Tr. Volume XVI at 2909-16.)  It is not as clear that this issue was waived.  In its post-trial briefs and when this was raised to the Court, however, defendants have never offered more than general assertions that their view was based directly on Judge Doty's Order.  To the extent that they sought to use Judge Doty's Order to corroborate their reliance on their attorney's opinions – which were challenged extensively at trial – the Court notes that the two opinions in question were written before Judge Doty's Order, and after the Federal Circuit's reversal, respectively.  (*See id.* at 2913-14.)  Accordingly, defendants have not proven this issue as a matter of law.  As to whether this would be a basis for a new trial, the Court notes, again, that allowing this evidence in may well have compromised the entire trial, and that defendants could simply have made the stronger argument that this Order made their specific intent legally impossible.  In light of their decision to make a

(Footnote continued on next page.)

Accordingly, defendants' motion for judgment as a matter of law and motion for new trial on this issue are denied.

### b.    Inducement After 2003

In addition to the intent requirement discussed above, a party alleging inducement infringement must show "that the alleged infringer's actions induced infringing acts." *Manville*, 917 F.2d at 553.  Defendants argue that there was insufficient evidence that Raymond Price or Gerald Price took affirmative acts to induce infringement after 2003, when they purportedly sold the defendant companies to family.  Defendants argue that because Anchor's inducement claims against Rockwood and Equipment relied on evidence of actions by Raymond or Gerald Price, those claims must fail as well.

As Anchor points out, however, the record contains considerable circumstantial evidence that both Raymond and Gerald Price continued to exert control over the defendant companies – and continued to induce infringing acts – after the sales.  Both have remained on the board of directors of both Rockwood and GLS, (*see* Trial Tr. Volume IX at 1506-07), Gerald was the recipient of the correspondence concerning the legal status of their allegedly infringing blocks, (*see* Moerke Decl. Ex. 2, 3), and both continued to receive six-figure salaries as "consultants."  (*See id.* at 1496-97).  This came after a lengthy period when Raymond and Gerald Price were undisputedly controlling the

_____

(Footnote continued.)

weaker argument (that had the potential to prejudicially impact the rest of the case) the Court finds no basis for granting them an opportunity to try this five-week trial again.

operations of the defendant companies. (*See, e.g.*, Trial Tr. Volume VI at 1061-64.) On the basis of all of these facts taken together, along with the jury's conclusion that several of defendants' blocks infringed on Anchor's patents, there was sufficient evidence for the jury to infer that Raymond and Gerald Price actively encouraged infringement after 2003. Accordingly, this argument is also an insufficient basis for reversing the inducement findings against Rockwood and Equipment.

### c.      Inducement by Equipment

Defendants briefly argue that there could be no evidence in the record of any affirmative acts to induce infringement on the part of Equipment, because it has no employees.  Defendants do not dispute, however, that Equipment was initially founded and operated by the Prices – whose intent to induce infringement was a question for the jury – and that Equipment's property was integral to the creation of infringing blocks. *See Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 774 (Fed. Cir. 1993) (explaining that "a party's acts in connection with selling equipment may . . . constitute active inducement of infringement").  In those circumstances, there was a sufficient basis for the jury to find that Equipment induced infringement of Anchor's patents.

### 2.      Validity of the Vertica Patents

Defendants next argue that Anchor's Vertica patents are invalid as a matter of law. Defendants point to the testimony of Thomas Nikolai, who testified that each claim limitation of the Vertica patents was found in the Japanese Onishi Reference.  Defendants contend that Nikolai's testimony went unrebutted, and that the Vertica patents were

therefore anticipated as a matter of law.  Defendants' contention, however, is inconsistent with the Federal Circuit's explanation of the evidentiary burdens applicable to invalidity claims.

Courts presume that a patent issued by the PTO is valid.  *Pfizer v. Apotex, Inc.*, 480 F.3d 1348 (Fed. Cir. 2007).  Thus, where a party challenges a patent's validity "the patent challenger bears the burden of proving the factual elements of invalidity by clear and convincing evidence."  *Id.*  Accordingly, even where a party challenging a patent brings forward evidence tending to demonstrate invalidity, the "presumption [of validity] remains intact and [the burden of proof remains] on the challenger throughout the litigation, and the clear and convincing standard does not change."  *Id.* at 1360.  In short, "a patentee never **must** submit evidence to support a conclusion by a judge or jury that a patent remains valid."  *Id.* (emphasis added).

Here, the defendants assert that "Anchor identified no reason why Mr. Nikolai's analysis was wrong."  (Docket No. 700 at 5.)  The standards set forth above, however, clearly indicate that Anchor was not required to do so.  Rather, the burden was on the **defendants** to submit clear and convincing evidence that the patent was invalid.  The jury found that they did not do so – and the mere fact that Anchor did not submit further evidence on this issue or provide further rebuttal of Nikolai – is not a valid basis for this Court to override that determination.

Defendants similarly argue that they presented legally conclusive evidence that the Vertica patents were anticipated by their Classic block.  However, in an Order issued on September 7, 2004, this Court expressly excluded this theory from the case, squarely

stating that it "may not be raised in trial." *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, No. 99-1356, 2004 WL 2066823, at *5 (D. Minn. Sept. 7, 2004). Later, when this issue was raised again before trial, the Court affirmed this ruling. (Tr. of Hr'g on Mots. in Limine, Docket No. 580 at 24.) While some limited mention of the Classic blocks was permitted for background purposes, the defendants' anticipation argument was not among the theories it was permitted to present to the jury, and this theory was not included in the jury's written instructions. (*Id.*; Docket No. 636.) In those circumstances, the Court finds no basis for revisiting this issue, and there is no basis for granting defendants judgment as a matter of law. Accordingly, defendants' motion concerning the Vertica patents is denied to the extent that it seeks judgment as a matter of law.

### 3.    Validity of the Diamond Patents

Defendants next argue that Anchor's Diamond patents are invalid as a matter of law. Defendants contend that these patents were anticipated by defendants' Garden Wall block and obvious in light of the combination of the Johnson block with the pinned Keystone block or the pinned Diamond block. These contentions are addressed separately below.

### a.    Anticipation by the Garden Wall Block

"An issued patent is presumed valid and the burden is on the party challenging the validity of a patent to show that it is invalid by clear and convincing evidence." *Minn. Mining & Mfg. Co.*, 303 F.3d at 1301. One way in which a patent is anticipated under 35

U.S.C. § 102(a) is if "the invention was known or used by others in this country." "For prior art to anticipate under 35 U.S.C. § 102(a) because it is 'known,' the knowledge must be publicly accessible, and it must be sufficient to enable one with ordinary skill in the art to practice the invention." *Minn. Mining & Mfg.*, 303 F.3d at 1301 (citations omitted).

Defendants argue that Anchor's Diamond patents were anticipated by Robert MacDonald and Paul Forsberg's drawings for the Garden Wall block. Defendants contend that these drawings were completed late in the evening of March 21, 1989, and early in the morning of March 22. Defendants argue that the idea embodied in these drawings was sufficiently publicized when it was presented at a sales meeting at Menard's on March 22. Finally, defendants contend that it was not necessary to show that this idea was actually reduced to practice in order to establish anticipation under § 102(a).

Anchor responds that the evidence proves they conceived of the Diamond block in February, approximately a month in advance of the Menard's meeting. Anchor also argues that defendants failed to provide clear and convincing evidence that MacDonald and Forsberg sufficiently publicized the Garden Wall block. Finally, Anchor argues that the Garden Wall block cannot be treated as anticipating prior art because it was not reduced to practice.

At the close of evidence, the Court granted Anchor's motion to exclude defendants' Garden Wall-based invalidity theory from the case. The Court agrees with Anchor that defendants have not presented an adequate basis for reversing that

determination.  As noted above, in order for defendants to prevail on this issue, they were required to bring forward clear and convincing evidence that (1) they had knowledge sufficient to enable the Garden Wall block to be created; and (2) that this enabling information was publicly accessible.  *Minn. Mining & Mfg. Co.*, 303 F.3d at 1301. Regardless of whether the defendants were required to demonstrate that they had reduced the Garden Wall block to practice,[6] they failed to provide clear and convincing evidence that they made enabling knowledge "public."

The mere sharing of knowledge among employees within the same company is insufficient to meet the publicity requirement of § 102(a).  *See, e.g., Stamicarbon, N.V. v. Escambia Chem. Corp.*, 300 F. Supp. 1209, 1214 (N.D. Fla. 1969) (noting that knowledge had been kept among a company and its close affiliates).  Thus, in order to prevail, defendants were required to show that they disclosed adequate detail to allow a third party to reduce the Garden Wall blocks to practice.  *See In re Borst*, 345 F.2d 851, 855 (C.C.P.A. 1965) ("[T]he criterion should be whether the disclosure is sufficient to enable one skilled in the art to reduce the disclosed invention to practice.").  Defendants contend that they did so in their May 22, 1989, meeting at Menard's.  However, the only witnesses defendants' called to discuss this meeting – Forsberg and MacDonald – were

---

[6] In the dispute over whether defendants were required to reduce their idea to practice in order to support their anticipation theory, defendants rely primarily on a 1965 case from the Court of Customs and Patent Appeals, *In re Borst*, 345 F.2d 851, and Anchor relies primarily on a case decided in 1873. *Coffin v. Ogden*, 85 U.S. 120 (1873).  While this dispute was at the core of the arguments on anticipation presented at trial, the Court need not revisit it here, because of the analysis given below.  Even if no actual reduction of practice is required, there is insufficient evidence in the record demonstrating that defendants' idea was sufficiently publicized to satisfy § 102(a).

not at the meeting.  Consequently, while both testified that they believed the Garden Wall block was the subject of the nearly ten-year old Menard's meeting, they had no personal knowledge as to what was actually disclosed.  This is particularly critical in a § 102(a) public knowledge case, because, as noted above, defendants were required to prove more than mere general disclosure of their idea.  Defendants were required to prove – by clear and convincing evidence – that they offered sufficient detail to enable the third party to "practice the invention."  Mere cursory discussion about the block's qualities, for example, could well have come up short.  The speculation of Forsberg and MacDonald in this case is insufficient to meet their burden.[7]

Defendants seek to close this evidentiary gap by providing a memo written by Dave Jenkyns, one of the meeting participants.  (Moerke Decl. Ex. 14.)  The portion of that memo concerning the Menard's meeting states:

Al Pfannenstein, Steve Ahrens (Best) and I met with them in March.  They liked Keystone but we were too late for their 1989 selling year.  (Same as with Knox in the Twin Cities.)  Anchor's Aztec mini-walls are being handled.

(*Id*.)  In short, while this memo suggests that there was indeed a meeting with Menard's, it does not specifically mention the Garden Wall block, or provide any indication of what details about the block (if any) were disclosed.  Finally, defendants do not dispute

---

[7] While credibility is generally a question for the jury, the Court also observes that MacDonald and Forsberg are the founders of a company that has apparently taken a license to the challenged patents.  This type of interest has been relied on elsewhere as a reason to reject oral testimony as a basis for invaliding patents.  *See Woodland Trust v. Flowertree Nursery, Inc*., 148 F.3d 1368, 1371 (Fed. Cir. 1998) (discussing the circumstances in which courts may reject oral testimony in invalidity disputes).

Anchor's contention that Pfannenstein, who was listed as a participant at the Menard's meeting, remains in Minnesota, within this Court's subpoena power. Pfannenstein was not called as a witness at trial. In those circumstances, the Court finds that no reasonable juror could have concluded that the defendants offered clear and convincing evidence of anticipation under § 102(a).

### b.    Obviousness

Defendants also argue that Anchor's Diamond patents were obvious as a matter of law, in light of pre-existing features of the Johnson block, the pinned Keystone blocks, and the pinned Diamond blocks.

A patent is invalid as "obvious" where "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). The underlying factual issues relevant to obviousness are "(1) the scope and content of the prior art; (2) the level of ordinary skill in the prior art; (3) the differences between the claimed invention and the prior art; and (4) any objective indicia such as commercial success or long-felt need." *Upjohn Co. v. Mova Pharm. Corp.*, 225 F.3d 1306, 1310 (Fed. Cir. 2000). In short, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1739 (2007). In reviewing a jury verdict on obviousness, the Court reviews the evidence in the manner most favorable to the verdict. *Upjohn Co.*, 225 F.3d at 1310.

Defendants suggest that the Diamond patents merely added a rear "lip"[8] to stackable, diamond-shaped retaining-wall blocks.  Defendants allege that this innovation was obvious, because the market already contained a number of diamond-shaped retaining-wall blocks – including Keystone and pinned Diamond blocks that were secured using pins – and a Johnson block that contained a rear lip along with a pin.

Defendants also argue that a finding of obviousness is supported by various "secondary factors."  "Such secondary factors as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented."  *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17-18 (1966).  As secondary indications of the Diamond patent's obviousness, defendants point to Keystone's alleged independent development of the Garden Wall block; the ease with which existing production processes were adapted for the new Diamond block; and the inevitability of commercial success for a retaining-wall block that was easy to use.

Anchor responds that the lawyers who now contend that the Diamond patents were obvious never suggested this in their earlier opinion letters to the Prices.  In addition, Anchor contends that a reasonable juror could have found that the Johnson block does not qualify as prior art, because there was no definitive evidence at trial about when the Johnson block was invented.  Finally, Anchor points to secondary, circumstantial evidence of non-obviousness, including the creation of copycat blocks by other

---

[8] The purpose of this lip was to prevent the blocks from sliding after they had been stacked.

manufacturers; the decision of several competitors to purchase a license to use the Diamond patent's design; the skepticism of some observers about whether the design would succeed; and the tremendous commercial success of the patented invention.

The Court agrees with Anchor that a reasonable juror could conclude that defendants failed to bring forward clear and convincing evidence of obviousness. Even if defendants are correct that all of the elements of the Diamond patent were known prior to their invention, this alone is not enough to demonstrate obviousness. *See Envtl. Designs Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 698 (Fed. Cir. 1983) ("Virtually all inventions are combinations and virtually all are combinations of old elements.") Rather, the question is "what the prior art as a whole would have suggested to one skilled in the art." *Id*. Here, whether the subtle shift from pin-focused blocks to the Diamond design would have been so suggested was a close question. However, the Court agrees with Anchor that additional, objective indicia confirm that this was an appropriate question for the jury. Anchor notes that more than 875 million blocks covered by the Diamond patents have been sold since 1990. This extraordinary commercial success – in combination with indications that other manufacturers have acquired licenses to use the patented invention – strongly suggests that Anchor's design was a novel, valuable innovation. *See, e.g.*, *Tec Air, Inc. v. Denso Mfg. Mich. Inc*., 192 F.3d 1353, 1360-61 (Fed. Cir. 1999) (agreeing that obviousness was a question for the jury where the plaintiff had sold approximately two million units of the patented invention per month). Alongside the inconclusive evidence about how obvious Anchor's subtle improvement was in light of prior art, this background data was sufficient to make a legal

determination of obviousness inappropriate. *Cf. In re Inland Steel Co.*, 265 F.3d 1354, 1366 (Fed. Cir. 2001) (finding commercial success inadequate to rebut invalidity where there was a **strong** prima facie case of obviousness).  Accordingly, defendants' motion for judgment as a matter of law as to the obviousness of Anchor's Diamond patents is denied.

### B.     Motions for a New Trial

Under Rule 59(a) of the Federal Rules of Civil Procedure, the Court may grant a motion for a new trial on all issues or on particular issues.  In order to grant a motion for a new trial under Rule 59(a), this Court "must believe . . . that the verdict was so contrary to the evidence as to amount to a miscarriage of justice." *Butler v. French*, 83 F.3d 942, 944 (8th Cir. 1996).  Even where the court has made evidentiary errors, a new trial is only warranted "when the cumulative effect of the errors is to substantially influence the jury's verdict." *Williams v. Kansas City, Mo.*, 223 F.3d 749, 755 (8th Cir. 2000).

### 1.     Inducement

Defendants argue that they are entitled to a new trial on their inducement claims, because (1) Judge Doty's Order should not have been excluded; (2) there was insufficient evidence that the Prices engaged in affirmative acts to induce infringement after 2003; (3) there was insufficient evidence that Equipment engaged in affirmative acts to induce infringement; (4) defendants were improperly barred from introducing evidence concerning the patent reexamination proceedings; (5) the jury's inducement findings were inconsistent with the jury's finding that defendants did not willfully infringe; and

(6) "the trial was rife with improper evidence and argument," including evidence concerning the defendants' asset transfers and Anchor's counsel calling Mal Moore a "liar" in closing argument.   The Court is not persuaded that these issues – either individually or collectively – merit a new trial.

As to Judge Doty's Order, the Prices infringing acts following 2003, and Equipment, the Court concludes that a new trial is not warranted for the reasons given above, in this Court's analysis of defendants' motions for judgment as a matter of law. As to the reexamination proceedings, defendants appear to contend that they should have been allowed to present evidence that at some point during the proceedings, the PTO had concluded that Anchor's patents were invalid.   Defendants, however, do not dispute that the PTO's ultimate determinations were in Anchor's favor.   In those circumstances, the probative value of any further information about intermediate steps in the reexamination process would have been far outweighed by the delay and confusion that would have resulted from fully and accurately explaining the twists and turns of the examination process to the jury.   *See* Fed. R. Evid. 403.   As to differences in the jury's findings concerning willful infringement and inducement, the burdens of proof for those findings are different.   Anchor was required to prove willful infringement by clear and convincing evidence, while it was merely required to prove inducement by a preponderance of the evidence.   The fact that the jury found sufficient evidence of inducement without finding sufficient evidence of willful infringement merely demonstrates the closeness of the issues in this case.

As to defendants' assertion of improper evidence and argument, the Court finds nothing in the record significant enough to require a new trial. Defendants were able to present their interpretation of the defendants' asset transfers to the jury, and the veracity of Moore's testimony was squarely at issue in light of Anchor's willfulness and inducement claims. Anchor's handling of those issues did not rise to the level necessary to justify a new trial. Accordingly, defendants' motion for a new trial on Anchor's inducements claims is denied.

### 2.        Infringement of the '713 Patent

Defendants argue that they are entitled to a new trial on the question of whether the Cottage Stone III and Cottage Stone IV blocks infringe on the '713 Diamond patent. Defendants contend that the Court improperly allowed "irrelevant and misleading" testimony by Cecil Schmidt, an attorney involved in Anchor's initial pursuit of the Diamond patents. Defendants argue that Schmidt's testimony impermissibly strayed into his intentions for the scope of the patent and issues of functionality, when the jury's focus should have been limited to the definitions of critical patent terms provided by the Court. Anchor disagrees, arguing that Schmidt's testimony was consistent with the file history of its patent application and with the Court's claim construction, and that much of his testimony was not objected to at trial.

An infringement analysis involves two steps. First, the court determines the scope and meaning of the patent claims asserted. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998). Then, the fact-finder compares the construed claims with

the allegedly infringing product.  *Id.*  "The subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim (except as documented in the prosecution history)."  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 985 (Fed. Cir. 1995).

Here, the Court concludes that even if Schmidt's testimony inappropriately strayed into claim construction or functionality, its impact was not sufficient to warrant a new trial.  As Anchor points out, defendants asked Schmidt – and he confirmed – that in patent cases, what is in the written file history filed with the PTO is what is operative. (Trial Tr. Volume IV at 661.)  This ensured that the jury was given the appropriate legal principle from the very witness whose testimony defendants' are disputing.  In addition, the jury's written instructions gave the definitions for the disputed claim terms, and expressly indicated that the jury "must use these definitions in [its] consideration of infringement and invalidity issues."  (Docket No. 636 at 21.)  "A jury is presumed to follow its instructions."  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  As to matters of functionality, the Court notes that defendants have offered just two citations to brief passages of Schmidt's testimony, and a single reference from Anchor's closing argument. (*See* Trial Tr. Vol. III at 597, 608; Vol. XVI at 2990-91.)  The Court has carefully reviewed those brief references – which total less than a paragraph of a transcript that exceeds 3300 pages – and finds that they were insufficient to impact the jury's verdict. In sum, any stray remarks by Schmidt were insufficient to require a new trial.

### 3.    Validity of the Vertica Patents

Defendants also argue that they are entitled to a new trial because Thomas Nikolai was prevented from testifying about the details of the PTO reexamination proceedings. Defendants contend that the Vertica patents only survived reexamination because Anchor made an *ex parte* argument to the patent examiner.   Defendants argue that if they had been permitted to explain this to the jury, it would have been evident that the PTO largely agreed with Nikolai's challenge to the Vertica patents, and that Anchor's characterization of the Vertica patent changed between the reexamination and trial.

The Court disagrees that this is a sufficient basis for a new trial.  The jury was given thorough instructions as to how to make a validity determination.  (*See* Docket No. 636 at 31-54.)  While the Court indicated in its instructions that the jury could "consider" the fact that the PTO had reviewed the validity of Anchor's patents, *see Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 961 (Fed. Cir. 1986) ("A patent is presumed valid."), the Court did not instruct the jury that this fact changed the standard it should apply or otherwise removed the jury's responsibility to make a validity determination in the first instance.  (*See* Docket No. 636 at 52.)  In short, there is no reason to believe that the jury treated the course of the reexamination proceedings as material to its findings.  In those circumstances, in the context of a complex five-week trial, further discussion of those proceedings would have been a distraction from the core issues in the case, and inappropriate under Rule 403 of the Federal Rules of Evidence. Accordingly, defendants are not entitled to a new trial on the validity of Anchor's Vertica patents.

### 4.      Validity of the Diamond Patents

In arguing that they are entitled to a new trial on the validity of Anchor's Diamond patents, defendants argue that the jury should have been permitted to consider whether the Garden Wall block anticipated those patents.  As noted above, the Court concluded that this theory was properly excluded from this case.  Accordingly, this Court denies defendants' motion for a new trial on this issue.

### 5.      Damages

Defendants also argue that a new trial on damages is required, because (1) the damages verdict is "internally inconsistent" and not supported by the evidence submitted at trial; (2) the verdict inappropriately includes sales of non-infringing Cottage Stone blocks; (3) Anchor failed to establish proper notice under 35 U.S.C. § 287(a); and (4) Anchor's expert did not provide an adequate basis for suggesting that the jury add a 50% premium to the reasonable royalty rate.

"When a party files a motion to amend the judgment or in the alternative to grant a new trial on the amount of damages awarded by a jury, the . . . court determines whether the jury's verdict is against the clear or great weight of the evidence." *Unisplay, S.A. v. Am. Elec. Sign Co., Inc.*, 69 F.3d 512, 517 (Fed. Cir. 1995) (internal quotation marks omitted).  The court has "wide discretion in determining whether to grant a new trial under this standard." *Id*.

### a.    The "Internal Consistency" of the Verdict

As explained above, this case involved (1) allegations of inducement infringement against three companies with overlapping personnel and operations, (2) an additional allegation of direct infringement against one of these companies, and (3) allegations of inducement infringement against two individuals who played critical roles in the three defendant companies.  In those circumstances, asking the jury to determine and apportion damages among the defendants was an unusually complicated task.

This Court initially suggested a question that simply asked what damages should be assessed against each defendant.  (*See* Docket No. 635-2.)  When this issue was discussed in Court, however, the parties discussed the danger that the jury may simply come up with a total figure for damages and then include that number for each defendant. (Trial Tr. Volume XVI at 3123.)  The parties then agreed on an alternative format that addressed this concern.  The new form dealt with infringement of Anchor's Vertica patents and Diamond patents separately.  (*See* Docket No. 645 at 8.)  For any infringement of each set of patents, the form asked how much money Anchor was entitled to receive for "damages caused by GLS," and how much money it was entitled to receive for "damages caused by Rockwood."  (*Id.*)  The form then included questions asking who should be held responsible for each set of damages, with places for check-marks next to the names of all five defendants.  (*Id.* at 8-9.)  The parties stipulated to the use of this form on the record.  (Trial Tr. Vol. XVII at 3177.)

Under the question dealing with Anchor's Vertica patents, the jury indicated that Anchor is entitled to $9,694,360 for damages caused by GLS, and $9,694,360 for

damages caused by Rockwood.  The jury then indicated that each of the five defendants should be responsible for all of these damages.  As to the Diamond patents, the jury indicated that Anchor is entitled to $2,398,382 for damages caused by GLS, and $2,398,382 for damages caused by Rockwood.  As with the Vertica patents, the jury indicated that all five defendants should be responsible for all of these damages.

Defendants now argue that there is no basis for assessing these damage amounts against GLS.  Defendants contend that the evidence submitted at trial indicates that the sales by GLS totaled no more than $5,781,979 for blocks that infringed the Vertica patents and no more than $544,449 for blocks that infringed the Diamond patents.  Defendants add that the jury's confusion on these amounts is evident because they determined GLS caused the same damages as Rockwood, even though Rockwood sold many more blocks.

The Court agrees with Anchor that a new trial is unnecessary on this issue.  As an initial matter, the Court agrees with Anchor that the jury's answers are a reasonable reflection of the manner in which this case was tried.  Anchor repeatedly sought to portray the five defendants as a single "enterprise," noting that Raymond and Gerald Price had served, at various times, as the owners and operates of all three corporate defendants, (*see, e.g.*, Trial Tr. Volume VII at 1202-03); that the employees of all three companies were actually employed by GLS, (*see, e.g.*, Trial Tr. Volume V at 882, 884); and that GLS failed to pay Rockwood royalties consistent with a relationship between distinct, arms-length companies, (*see, e.g.*, Trial Tr. Volume IX at 1534).  Indeed, Gerald Price testified that Rockwood's licensees would "sometimes" send reports to Rockwood

and "sometimes" send reports to GLS.  (Trial Tr. Volume VIII at 1327.)  If the jury ultimately agreed with Anchor's contention, and reached the reasonable conclusion that there was no relevant distinction between the defendant companies as to the activities at the core of this case, then splitting the damages evenly between GLS and Rockwood would have been entirely appropriate.

The likelihood that this was the jury's view of the case is bolstered by its answers about who was responsible for GLS and Rockwood's respective damages.  In each case, the jury indicated that **all** *five* of the defendants are responsible for *all* of the assessed damages.  The fact that all five defendants were deemed responsible for every dollar suggests that the jury viewed them as a cooperative enterprise.  In addition, and most critical for defendants' specific objection about GLS, these answers included findings that Rockwood was responsible for all of GLS's damages, and that GLS was responsible for all of Rockwood's damages.  In light of those answers, any parsing out of which sales were attributable to which defendant would have served little purpose, and would have had no legal effect; because of the jury's check marks next to each defendant, no matter how the sales were parsed out, each defendant was deemed responsible for all of them.[9]

In short, the Court agrees with Anchor that the jury appears to simply have adopted its

---

[9] The Court notes that if the verdict form had asked the jury to assess damages arising from "sales" by Rockwood and GLS, then this issue may well have been more difficult.  In that case, the jury's answers may well have gone beyond the GLS "sales" that were supported by the record.  That is not, however, what the verdict form says.  The questions jointly requested by the parties ask the jury to list the "damages **caused**" by both parties.  (*See* Docket No. 645 (emphasis added).)  In other words, the verdict form did not expressly limit the jury to listing damages arising out of GLS's **sales**.

view of the relationship of the defendants, and returned a verdict that treats defendants as a cooperative enterprise.[10]

### b.        Non-Infringing Cottage Stone Blocks

Defendants next argue that they are entitled to a new trial on damages because of possible confusion regarding their Cottage Stone blocks.  The jury determined that the Cottage Stone II blocks did not infringe on Anchor's Diamond patents, but determined that the Cottage Stone III and Cottage Stone IV blocks infringed on the '713 patent. Defendants argue that the evidence submitted at trial gave the jury no reliable basis for subtracting the Cottage Stone II sales from the sales of the infringing blocks.  Thus, defendants argue, they are entitled to a new trial, where Anchor will be required to submit evidence that clearly pertains only to sales of Cottage Stone III and Cottage Stone IV blocks.

Anchor disagrees.  The jury's first determination in assessing damages was the date when those damages began accruing.  (*See* Docket No. 636 at 58 (instructing that "Anchor can recover damages for infringement that occurred only after Anchor gave

---

[10] In their reply, defendants briefly address this possibility by adding the argument that GLS could not have been responsible for any damages beyond their own sales.  Defendants treat this as a mere criticism of the jury's damage amounts.  The implications of this argument, however, extend further.  As noted above, the verdict form included a damages question specifically asking if GLS was responsible for the damages attributed to Rockwood.  This, along with the additional questions asking if any other defendants were responsible for the damages of either GLS or Rockwood, reflected a view that it was legally permissible to hold any of the defendants responsible for the damages caused by any other defendant.  As explained above, that damages format – and, in turn, that theory for how the damages could legally be apportioned – was stipulated to by the parties.  In those circumstances, after more than eight years of pre-trial litigation and a multi-week trial, the Court declines to consider this issue for the first time now.

notice of its patent rights.").)  The Court instructed the jury that it was to find this date by determining when Anchor gave defendants adequate notice of their infringement.  (*Id.*)  The Court noted that while Anchor generally alleged it had given adequate notice before January 1999, defendants argued that they had not received adequate notice as to the '015, '183 and '129 patents until September 1999, and had not received adequate notice as to the '713 patent until January 2001.  (*Id.*)  The jury ultimately concluded that among the Cottage Stone blocks, the only infringement was the infringement of the '713 patent by the Cottage Stone III and Cottage Stone IV blocks.

Anchor explains that since the jury knew that the '713 patent did not issue until November 2000 – and the '713 patent was the only patent the jury found to be infringed – it would not have calculated damages for any Cottage Stone blocks beginning in 1999; instead, Anchor argues, they would have used January 2001, because it was the only notice date in the jury instructions that would have been plausible for the infringed patent.  Thus, Anchor argues, the question of removing Cottage Stone II sales creates no difficulties at all, because sales of that block had stopped before January 2001.  In other words, Anchor suggests that in making its damage assessment, the Court can presume that the jury was using figures that simply did not involve Cottage Stone II blocks. Defendants reply that the Court cannot be certain that the jury used January 2001 as its start date, and that Anchor has not provided definitive proof that sales of Cottage Stone II blocks stopped before January 2001.

The Court agrees with Anchor that this issue does not require a new trial.  In order to agree that the jury's verdict was improper, the Court would have to presume that

(1) the jury rejected the position on the appropriate notice date that defendants (and Anchor) believe was best supported by the evidence (*i.e.* January 2001); and (2) in the absence of affirmative evidence demonstrating when the sales of Cottage Stone II blocks stopped, the jury improperly included such sales in its damage calculation.  As to the first of these presumptions, defendants could have requested an interrogatory on the verdict form specifically asking if the jury agreed with their view of the notice date.  They did not do so.  (*See* Docket No. 535.)  Instead, defendants successfully sought permission to present their view of the notice date in the actual text of the jury instructions.  (*See* Docket No. 636 at 58.)  In other words, defendants knew exactly how little information the Court and the parties would be receiving from the jury about the notice date.  In those circumstances, the Court will not grant a new trial based on the predictable uncertainty about what date the jury actually used.

As to the second presumption, defendants do not provide any estimate **of their own** for how long sales of Cottage Stone II continued.  Without such an explanation, the Court is left with mere speculation as to whether these blocks were actually sold at a time that would have been included in the jury's damages calculation, and mere speculation as to whether defendants' were prejudiced.  In sum, defendants' motion for a new trial based on the possible inclusion of Cottage Stone II blocks in the jury's damages calculation is denied.

### c.     Notice Under 35 U.S.C. § 287(a)

Defendants separately argue that this Court should order a new trial because Anchor did not substantiate an entitlement to pre-lawsuit damages.  In support of that argument, defendants again speculate that the jury may have used an improper notice date.  As noted above, defendants did not ask for a question on the verdict form asking what notice date was relied on by the jury.  That left the Court without any basis for concluding that pre-lawsuit damages were actually awarded.  In those circumstances, the Court will not grant a new trial based on mere speculation that the jury used an improper date.

### d.     Reasonable Royalty Rate

Finally, defendants argue that the jury's damages verdict was flawed because they used an improper royalty rate.  In support of this claim, defendants point to testimony by Anchor's damages expert, suggesting that the jury add 50% to its calculation.  Defendants argue that Smith did not present an adequate factual foundation for such an increase.

As Anchor points out (and defendants do not dispute), however, defendants did not (1) object during Smith's testimony; (2) call its own damages expert in response; or (3) request a question on the verdict form asking the jury to state what royalty rate it relied on.  Instead, defendants agreed to a reasonable royalty instruction telling the jury to treat expert opinion as one factor among many in making its royalty calculation, and stipulated to a verdict form that was certain to keep the jury's adopted royalty rate a

mystery.  As with the notice date, neither the parties nor the Court can be certain about what rate was used by the jury, because the parties jointly crafted an approach to this issue that kept that determination hidden.  In those circumstances, the notion that the jury relied on Smith's suggested approach in a manner that prejudiced defendants is nothing more than speculation, and this issue is therefore not an appropriate basis for a new trial.[11]

## II.   PATENT NO. 5,709,062 AND THE STONEHEDGE AND LEGEND BLOCKS

On December 12, 2007, the parties entered into a stipulation regarding Rockwood's Legend and StoneHedge blocks.  (Docket No. 490).  The parties agreed that "if the jury of Court finds that the Classic block product infringes any claim of the '183 patent or '129 patent asserted at trial (even if such claim also is found invalid)," then the Court should include a number of additional findings in its final judgment.  (*Id.*)  The jury made the necessary findings to trigger this stipulation.   (*See* Docket No. 645.) Accordingly, the Court has included the stipulated findings below.

---

[11]  The Court notes that defendants have filed five separate substantive motions and fifteen separate briefs, consisting of several hundred pages of challenges to the trial.  The Court reserves comment on whether this is consistent with the local rules, and notes that where defendants filed more than one moving brief under the heading of the same motion (e.g. Motion for New Trial on Damages), the Court limited its consideration to the later-filed brief.  The Court also notes that any of the defendants' dozens of contentions not explicitly discussed in the material included above were carefully considered by the Court, and deemed inadequate to justify a new trial or judgment as a matter of law.

### III.   ATTORNEY'S FEES, INTEREST AND COSTS

#### A.   Attorney's Fees

35 U.S.C. § 285 provides for the "award [of] reasonable attorney fees to the prevailing party" in "exceptional" patent infringement cases.  "The prevailing party must prove the exceptional nature of the case by clear and convincing evidence."  *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 669 (Fed. Cir. 2000).  "Only if a court finds that a prevailing party satisfies its burden of proving an exceptional case does it determine whether to award attorney fees."  *Id.*  "Bad faith and willful infringement are not the only criteria whereby a case may be deemed to be 'exceptional,' although when either is present the requirement is more readily met."  *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed. Cir. 1996).  "Litigation misconduct and unprofessional behavior are relevant to the award of attorney fees, and may suffice to make a case exceptional under § 285."  *Id.*  "The purpose of § 285 when applied to accused infringers is generally said to be two-fold:  one, it discourages infringements by penalizing the infringer; and two, it prevents gross injustice when the accused infringer has litigated in bad faith."  *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1553 (Fed. Cir. 1989) (internal quotation marks omitted).

Here, there are several indications in the record that this was a close case.  As noted above, defendants initially brought a successful motion for summary judgment.  Then, after that judgment was reversed and the case went to trial, the jury returned a mixed verdict.  Finally, while the jury concluded that Anchor met its burden on its inducement claims – requiring proof beyond a preponderance of the evidence that

defendants specifically intended to induce infringement – it expressly concluded that Anchor did not prove willful infringement by clear and convincing evidence. These factors suggest that there was no bad faith in defendants' decision to aggressively defend this case through trial. This background also takes this case out of the typical category of cases in which attorney's fees are awarded. *See Beckman*, 892 F.2d at 1552 ("[W]e are aware of few cases in which a patent owner has been granted attorney fees solely on the basis of litigation misconduct, without a concurrent finding of willful infringement."). While Anchor has alleged a variety of instances of misconduct throughout the course of trial, the Court finds nothing in the record that provides the clear and convincing evidence necessary for a fee award. Accordingly, Anchor's request for attorney's fees is denied.

### B.     Prejudgment Interest

Anchor seeks an award of prejudgment interest pursuant to 35 U.S.C. § 284. It is well established that "prejudgment interest should be awarded under § 284 absent some justification for withholding such an award." *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983). This is to comply with Congress's "overriding purpose of affording patent owners complete compensation" for infringement. *Id*. at 656. The only recognized reason to withhold prejudgment interest is where "the patent owner has been responsible for undue delay" in enforcing its patent rights. *Id*. at 657; *Allen Archery, Inc. v. Browning Mfg. Co.*, 898 F.2d 787, 791 (Fed. Cir. 1990). However, withholding

prejudgment interest based on delay "is the exception, not the rule." *Lummus Indus., Inc. v. D.M. & E. Corp.*, 862 F.2d 267, 275 (Fed. Cir. 1988); *Maxwell*, 879 F. Supp. at 1009.

Defendants do not dispute that Anchor is entitled to prejudgment interest. They argue, however, that there are several grounds for reducing the amount requested by Anchor. First, they argue that Anchor is not entitled to interest for the period when the case was stayed to allow a reexamination of Anchor's patents. The Court disagrees. As Anchor argues, there was nothing "undue" about the delay for reexamination. If the PTO had determined that some or all of Anchor's patents were invalid, this trial may have been shortened or unnecessary. *See Allen Archery, Inc.*, 898 F.2d at 792 (concluding that a delay was not "undue" where there was another live proceeding addressing the validity of the disputed patents). In addition, the reexamination of Anchor's patents was initiated by defendants.

Second, defendants argue that Anchor is not entitled to interest prior to the commencement of this lawsuit. In patent cases interest is awarded "from the time that royalty payments would have been received." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655-56 (1983). Here, an attorney who was working on behalf of the Prices in the late 1990s testified that "at the end of '98 and the beginning of '99" he and his colleagues "understood that Anchor was saying to Rockwood that you're infringing the

patents." (Trial Tr. Volume IV at 713.) In those circumstances, an interest period beginning on January 1999 is appropriate.[12]

Finally, defendants argue that Anchor's interest figure was calculated incorrectly. Defendants argue that Anchor was required to restrict its recovery to simple interest (rather than compound interest) and round the annual interest rate to the nearest one percent. As Anchor points out, however, the calculations in fact use simple interest rather than compound interest. (*See* Smith Decl. Ex. 2.) As to the question of rounding, defendants rely on a formula in Minn. Stat. § 549.09(c). As Anchor points out, however, this Court is not bound by state law in setting the prejudgment interest rate. *See, e.g.*, *EEOC v. Liggett & Myers Inc.*, 690 F.2d 1072, 1074 (4th Cir. 1982). The Court approves Anchor's use of the more precise, applicable rate. Accordingly, the Court grants Anchor's request for $4,923,358 in prejudgment interest.

## C.     Post-judgment Interest

The parties agree that Anchor is entitled to postjudgment interest. *See* 28 U.S.C. § 1961. The parties will not be able to determine the appropriate amount, however, until it is clear when the judgment will be paid. Accordingly, the Court orders defendants to make an interest payment in accordance with the formula set forth in 28 U.S.C. § 1961.

---

[12] Defendants also argue that GLS did not have notice of any infringement until 2001. The Court does not agree that different notice dates for different defendants is appropriate in this case in light of their overlapping personnel and activities.

### D.      Costs

Rule 54(d) of the Federal Rules of Civil Procedure states that costs should be awarded to the "prevailing party."  Defendants argue that each side should bear its own costs in this action because Anchor was not successful on all of its claims.  The Federal Circuit recently rejected such an argument, noting "there is no rule requiring courts to apportion costs according to the relative success of the parties."  *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1348 (Fed. Cir. 2006).  "In fact, apportioning costs according to the relative success of parties is appropriate only under limited circumstances, such as when the costs incurred are greatly disproportionate to the relief obtained."  *Id.*  Here, the jury granted Anchor more than $24 million in damages in a verdict that was substantially in Anchor's favor.  That verdict is sufficient to make Anchor a "prevailing party" for the purposes of Rule 54.  Accordingly, Anchor should submit a bill of its costs that are recoverable under Rule 54.

## IV.   STAY OF PROCEEDINGS TO ENFORCE JUDGMENT

On July 14, 2008, this Court issued an Order enjoining Anchor from seeking to enforce the judgment in this case until further order of the Court.  Anchor currently has two motions pending seeking to lift that injunction in whole or in part.  (Docket Nos. 795, 799.)  That injunction is now lifted.  Accordingly, Anchor's motions are granted, and it is free to seek execution of the judgment in all respects.  Any further requests to stay execution of the judgment should be addressed to the Federal Circuit Court of Appeals.

## V.    MOTION FOR CONTEMPT[13]

Anchor has also filed a motion seeking to hold defendants in contempt for allegedly violating this Court's injunction against further infringement.  (*See* Docket No. 787-2.)  That injunction barred defendants from making, using, selling, or offering for sale any of the blocks that the jury found to infringe, or "any other product no more than colorably different from such blocks."  (*Id*.)  Anchor contends that defendants have violated this injunction by producing a block that is nearly identical to the infringing Classic block.

"[A] judgment of contempt against an enjoined party for violation of an injunction against patent infringement by the making, using or selling of a modified device may not be upheld without a finding that the modified device falls **within the admitted or adjudicated scope** of the claims and is, therefore, an infringement."  *KSM Fastening Sys., Inc. v. H.A. Jones Co., Inc.*, 776 F.2d 1522, 1530 (Fed. Cir. 1985) (emphasis added). "If there are substantial open issues with respect to infringement to be tried, contempt proceedings are inappropriate."  *Id*. at 1532.  Here, the modified block at issue has added a new "notch," purportedly to allow the use of a pipe to further secure a retaining wall. Anchor contends that consumers are unlikely to actually use this notch, and that this new block should therefore be deemed no more than "colorably different" from defendants' Classic block.  As the foregoing discussion demonstrates, however, subtle changes in

---

[13] The Court has not yet received a response from defendants addressing this motion. After reviewing the brief submitted by Anchor, however, the Court has concluded that no further briefing is necessary to assist the Court in providing a ruling.

block design have the potential to significantly impact a block's usefulness and marketability. While this notch may well not be considered useful by all of its current users, that does not provide adequate assurance that this will not change over time, as consumers become more familiar with its potential. In sum, the Court is not prepared to conclusively rule on this issue in a summary contempt proceeding. Accordingly, any claim that defendants' new product infringes on Anchor's product must be pursued in a new lawsuit. Anchor's motion to hold defendants in contempt is denied.

## ORDER

Based on the foregoing, all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendants' Motion for Judgment as a Matter of Law or for a New Trial on the Issue of Induced Infringement [Docket No. 656] is **DENIED**.

2.      Defendants' Motion for a New Trial on Infringement of the '713 Patent [Docket No. 661] is **DENIED**.

3.      Defendants' Motion for Judgment as a Matter of Law or for a New Trial as to Whether the Vertica Patent Family is Invalid [Docket No. 664] is **DENIED**.

4.      Defendants' Motion for Judgment as a Matter of Law or for a New Trial as to Whether the Diamond Patent Family is Invalid [Docket No. 668] is **DENIED**.

5.      Defendants' Motion for New Trial on Damages [Docket No. 671] is **DENIED**.

6.      Anchor's Supplemental Motion for Attorney Fees, Costs, and Prejudgment and Postjudgment Interest [Docket No. 689] is **GRANTED in part** and **DENIED in part**.  The motion is **DENIED** as to Anchor's request for attorney's fees and **GRANTED** as to Anchor's request for prejudgment interest, postjudgment interest, and costs.

7.      Anchor's Motion for Entry of Final Judgment with Respect to United States Patent No. 5,709,062 and Stonehedge and Legend Blocks under Federal Rule of Civil Procedure 54(b), and for Right to Execute on Such Judgment [Docket No. 788] is **GRANTED**.

8.      The Court **AMENDS** the judgment entered in this case [Docket No. 646] to include the following

      a.      Defendants are ordered to pay Anchor prejudgment interest in the amount of $4,923,358.

      b.      Defendants are ordered to pay Anchor post-judgment interest in accordance with the formula set forth in 28 U.S.C. § 1961.

      c.      The StoneHedge and Legend block products infringe the '062 patent.

      d.      The StoneHedge block product infringes claims 14 and 15 of the '183 patent.

      e.      The Legend block product infringes claims 14, 15, and 16 of the '183 patent and claim 3 of the '129 patent.

   f.  Defendants are jointly and severally liable for damages due to the infringement of the StoneHedge and Legend block products in the amount of $127,000.

   g.  Anchor is ordered to submit a bill of costs within ten days of the date of this Order.

 9.  This Court's injunction barring Anchor from seeking to enforce the judgment in this case [Docket No. 787-2] is **LIFTED**.

 10.  Anchor's Motion for Clarification and Leave to Continue State Court Proceedings against Defendants' Transferees [Docket No. 795] is **GRANTED**.

 11.  Anchor's Motion to Lift Temporary Stay [Docket No. 799] is **GRANTED**.

 12.  Anchor's Motion to Hold Defendants in Contempt for Violating this Court's Injunction [Docket No. 806] is **DENIED** without prejudice to Anchor's right to pursue its allegations in a new lawsuit.

   **LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: March 31, 2009      ___s/ John R. Tunheim___
at Minneapolis, Minnesota.     JOHN R. TUNHEIM
             United States District Judge